Filed 6/27/16  In re Logan L. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re LOGAN L. et al., Persons Coming Under the Juvenile Court Law. | B266977 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK12647 ) |
| Plaintiff and Appellant, | |
| v. | |
| ANGELA M., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for minors.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Respondent, Angela M.

Mary C. Wickham, County Counsel, Dawyn R. Harrison, Assistant County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Appellant.

This is an appeal by the Department of Children and Family Services (DCFS) and two minors from an order dismissing a juvenile dependency petition filed pursuant to Welfare and Institutions Code[1] section 300, subdivision (b). We conclude that the juvenile court properly found that mother's prescription drug use did not put her children at substantial risk of serious physical harm, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Detention

Logan L. (born November 2002) is the son of Angela M. (mother) and Jeffrey L. (Jeffrey). Olivia C. (born February 2012) is the daughter of mother and Ray C. (Ray).

On July 24, 2015, mother appeared to lose consciousness while eating in a sushi restaurant with three-year-old Olivia and a friend. A bystander called 9-1-1, and mother was brought by ambulance to a hospital emergency room (ER). At the time mother was admitted to the hospital, her speech was slow and slurred and she was reported to be lapsing in and out of consciousness. The ER physician reported that mother's toxicology screen was positive for opiates, and the hospital social worker reported that mother acknowledged having used medical marijuana. Mother reported also having taken Soma (carisoprodol), a muscle relaxant.

A children's social worker (CSW) interviewed mother, who blamed the hospital for exaggerating the situation and said she was capable of taking care of her children. Mother admitted using medical marijuana a day earlier. Mother said she took medication three times a day for anxiety and Soma for pain. She denied overdosing on Soma, but admitted taking one Soma before going to the sushi restaurant.

The CSW interviewed the sushi restaurant's staff, who said mother had been in the restaurant before, most recently several months earlier. On that occasion, too, she had appeared to be under the influence of a substance.

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

Logan's father, Jeffrey, said he and mother shared physical custody of Logan, but lately Logan had been with him all the time because mother had been ill. Jeffrey said mother had recently had weight loss surgery and had difficulty eating. Jeffrey said mother "has had pill problems in the past," but that he had no concerns about mother's ability to safely care for the children.

Olivia's father, Ray, said mother had had full physical custody of Olivia since he and mother separated a year and a half earlier. He said mother recently had been hospitalized, and as a result of surgery was not able to eat or drink. According to Ray, mother "has been on so many medications that no one can tell what she is taking and how the medication is affecting her behavior." However, Ray believed mother could take care of herself and Olivia. He said he saw Olivia every day and had no suspicions she was being neglected.

Logan said that mother did not abuse drugs or alcohol and that he had never noticed her to have mood swings or other unusual behavior. Logan said he felt safe with mother. Olivia appeared healthy and appropriately dressed, and seemed well bonded to both parents.

A deputy sheriff advised that mother had been convicted of driving under the influence in 2005 and 2011, and had been placed on a psychiatric hold in 2011.

## II.

### Petition and Detention Hearing

DCFS filed a juvenile dependency petition on July 29, 2015. It alleged that the children were persons described by section 300, subdivision (b) because mother had a history of prescription medication abuse and was a current abuser of opiates, marijuana, and Soma, which rendered her incapable of providing the children with regular care and supervision. Further, "[o]n 7/24/15, the mother took an excessive amount of prescription medication and the mother received medical treatment as a result of the mother's conduct. On 7/24/15, the mother had a positive toxicology screen for opiates. On 7/24/15, the mother was under the influence of opiates and prescription medication while the child Olivia was in the mother's care and supervision. On 7/23/15 and on prior

3

occasions in 2015, the mother was under the influence of marijuana, while the children were in the mother's care and supervision. The mother has a criminal history of a conviction for driving while under the influence of alcohol. The mother's substance abuse endangers the children's physical health and safety, placing the children at risk of serious physical harm, damage, and danger."

The court held a detention hearing on July 29, 2015. It found a prima facie case for detaining the children and ordered them released to their fathers.

### III.

### Jurisdiction and Disposition Report

The jurisdiction/disposition report, filed August 27, 2015, stated as follows:

Mother told the CSW that she had been diagnosed with lupus three years earlier. She took morphine, Soma, and marijuana for pain, but never more than prescribed by her doctors. She was followed by a pain management doctor, a surgeon, a rheumatologist, and a primary care doctor. She had weight loss surgery on April 20, 2015, and had been in the hospital on and off for five weeks afterwards due to complications. The day mother was taken by ambulance from the sushi restaurant was the first day mother had been out of the house since her surgery. She felt nauseated and faint. She said she did not pass out, but it may have looked that way because she put her head down on the table.

Mother refused to sign a release giving the CSW permission to speak to her doctors. She said: "This is embarrassing. If they think that what you guys are saying is true, they will cut me off my medication. I haven't seen that doctor much. I don't want it to get to the point where he thinks I'm trouble and doesn't want to treat me. I have to do the best thing for my kids, and that means me getting better. I can't take a risk of getting cut off my treatment."

Both fathers said they believed their children were safe with mother. Olivia's father said mother had a condition that limited her ability to be in the sun: "When [mother] gets overheated or the sun is harsh, she gets where she needs to cool down . . . . We [were at] the Aquarium of the Pacific. She stayed too long in the sun. She had to sit in the cafeteria until she got better. Same thing [that happened] in the restaurant. If

4

anyone would have asked her, she would have said, 'Give me half an hour and let me rest for a while.' This is a non-issue."

Logan's father said Logan spent most of his time at his father's house, but when Logan was with mother, "I am not really worried about him. I know she loves him and takes care of him. [¶] . . . I know when she is with [Logan], she is good."

The paramedic who took mother to the ER on July 24 said when the paramedics arrived at the restaurant, mother was alert but could not stand on her own. Mother was able to make appropriate arrangements for Olivia.

The office manager for the surgeon who performed mother's weight loss surgery said mother had complications following surgery, including pain and difficulty keeping food down. The surgeon had ordered tests to find out why mother was having these problems. Mother was inconsistent in her follow-through.

The attending nurse at the hospital said when mother arrived at the ER, she was "lethargic and out of it. She was speaking slowly. You could tell she was overly medicated. I don't know if she was driving, but in no way should she have been caring for a child. First, she said she took 3-4 Soma. Later, she said she took only one extra one. She is on a lot of narcotic medication. She takes morphine, Ativan, and Soma. It could have been that it was too much. She was altered. She was slurred." Six hours after she arrived, mother was cleared to leave the ER because "[w]hatever it was had passed." The nurse noted that mother had asked for additional pain medication, but she was not given any.

The hospital social worker said when she saw mother, mother "was kind of in and out. [Mother] was able to answer questions, but at the same time, there was a lot going on." The social worker said she was concerned about Olivia's safety because she had received a report (subsequently determined not to be true) that mother had presented in the same impaired manner seven times in the last two weeks.

The restaurant owner said mother usually came to the restaurant once or twice a month and "always looks drunk." Mother told him she did not take drugs or drink alcohol but was on medication.

Mother's criminal history report said mother had been arrested for driving under the influence in 2005 and 2010. She pled no contest to misdemeanor driving under the influence and was placed on probation in 2005; subsequently, she pled no contest to misdemeanor reckless driving and was again placed on probation in 2011.

Olivia's father said he wanted the case to close and to be awarded custody of Olivia: "I would like to retain physical custody so there are no problems if something happened, but she should retain some rights. But as far [as who is] physically in charge of [Olivia] it would have to be me until she (mother) is healthy. . . . If her mom were 100%, I would have no problem returning to joint custody, it's just the health issues. She can't take care of her right now due to medical reasons." Logan's father also said the case should close: "I want this to end. . . . If things do change and they decide that I will get more custody, the only thing I would change is the child support. She could come see [Logan] whenever. It would be nice to make all the decisions, but I don't need to make all the decisions. I am comfortable with the way things have been. This is a nice, stable environment for Logan. His school is close. His friends come by. I know she loves him to death. Until she can take care of herself, I wonder about that. I get that she is his mother, and they love each other, and I don't want to change anything about that. It's really on her now."

DCFS said that it was not able to fully understand mother's medical condition because mother had not provided releases to allow DCFS to speak to her doctors. Further, it was concerned that each of mother's medications was prescribed by a different physician. However, "the Department does believe that the mother has serious medical problems (including lupus and surgery complications) which may require a certain amount of medication, and cause the mother a great deal of pain and discomfort. Even during [DCFS's] interview with mother, she became sick and proceeded to vomit midway through the interview. With consideration of the mother's flares of exhaustion, heat and sunlight sensitivity, inability to drive, constant vomiting, inability to eat, constant medical appointments, upcoming surgeries, and consuming a large quantity of strong medication on an empty stomach, she is unable to provide the constant care and

day to day tasks that the children require. . . . The family is hopeful that the mother will discover what went wrong with her surgery, and treat it so that she can get better, but at this time, the mother has not even received the recommended testing to begin the process of discovering the problems. It is unknown how long it will take for mother's symptoms to subside, and the children are not safe in the mother's care in her current condition. [¶] . . . The Department does not believe that DCFS involvement is warranted at this time, as both fathers are capable and willing to provide adequate care for the children. Both fathers are adamant that they would never keep the children from the mother, and want her to spend time with them; however, both fathers . . . are concerned due to the mother's abundance of medical problems. Therefore, the Department respectfully recommends that the Court sustain the petition, and that jurisdiction be terminated with a Family Law Order granting [the fathers full physical custody, and mother and the fathers joint legal custody]. It is further recommended that if the mother wishes to seek custody of the children in the future, that she provide proof that her medical condition is stable, and that she is taking all medications only as prescribed."

Attached to DCFS's report were seven letters written by mother's friends and neighbors; all said mother was a caring and attentive parent, and several said they would not hesitate to leave their children in mother's care.

An addendum report, also filed August 27, 2015, stated that mother's friend C. told the CSW she had no concerns about mother's ability to care for her children. C. said: "I would leave my kids with her. She is a good mom and a good person. She would never put her kids in harm's way. Her kids are always clean. She is so loving and nurturing. . . . This is the last mom you need to be worried about. I come over randomly. I see her almost every day. [I've] never seen her messed up (intoxicated) or messed up from meds."

## IV.

### Jurisdiction and Disposition Hearing

Mother testified at the contested jurisdiction/disposition hearing on August 27, 2015. She said she had lupus, which caused her to experience osteoarthritis and

7

sensitivity to sunlight.[2]  As a result of the osteoarthritis, she suffered extreme pain in her bones and joints.  In April 2015, she had surgery in which approximately 80 percent of her stomach was removed.  After the surgery, she had a difficult time eating and keeping down food and liquids.

Mother testified that on July 24, 2015, she took her usual morning medication between 7:30 and 8:00 a.m.—Levoyxl for her thyroid, pantroprazole for her stomach, Soma for muscle spasms, and morphine for bone and joint pain.  She did not take more pills than she had been prescribed.  She went to a sushi restaurant with her friend Megan; this was her first outing since the surgery.  She ordered a plate of mussels, but after eating two of them began to feel very light-headed, dizzy, and nauseated.  She attributed her dizziness to dehydration and lack of food.  Once at the hospital, she received a bag of intravenous fluid, but no other treatment.  A blood test revealed the presence of opiates, but she was not told that she had overdosed on opiates.  Since then, mother had continued taking her medication as prescribed, and she had not had another similar incident.

Mother acknowledged arrests in 2005 and 2010 for driving under the influence (DUI).  Mother said the 2005 conviction was alcohol related, and that she no longer drinks alcohol.  In 2010, she had just had knee surgery and was on new pain medication to which she reacted poorly.  She had not consumed any alcohol.  She was required to complete a DUI program, which she did.

Mother also acknowledged an incident in which unspecified classmates believed she had taken illegal drugs.  She went to the hospital for a drug test to prove there were no illegal drugs in her system.  However, she was taking an opiate at the time to control pain caused by lupus.  She no longer takes that opiate.  Currently, "we've got it

---

[2]     Reportedly, up to two thirds of people living with lupus report abnormal sensitivity to ultraviolet rays.  Exposure to sunlight can cause "increased disease activity with symptoms such as joint pains, weakness, fatigue and fever." (<http://www.lupus.org/research-news/entry/new-light-shed-on-photosensitivity-among-people-with-lupus> (as of June 22, 2016).)

[medication] all under control. I have been on the same medication for quite some time, and I have no problems with it."

Mother said her pain medication was prescribed by a pain management doctor. She also saw a rheumatologist who prescribed anti-inflammatory pills, but she had stopped taking them because they upset her stomach. She took Xanax in the hospital, but had not taken it since. She did not believe she had ever been prescribed Ativan. She used Trazodone occasionally to help her sleep.

Mother did not believe she had been given any discharge instructions when she left the hospital on July 24. She was surprised to learn that the hospital's doctors reported she should not take morphine and a muscle relaxant together, and that she should decrease the amount of narcotic medication she was taking.

Following argument, DCFS and children's counsel asked the court to sustain the petition; mother's counsel asked that the petition be dismissed.

The court stated it would dismiss the petition, explaining as follows: "If mother was an abuser of prescription medication one would expect two things. One would be that there would be blood tests made at the hospital in July of 2015 that would show excessive amounts of drugs. I don't think you can interpret the statement on page 16 that the labs came back fine as indicating that there was any evidence of excessive use of drugs at that time. You would also expect that the current doctor who's prescribing her medication would have been questioned [to] see if [he or she] has any concerns about [mother's current] use of the medications that he is prescribing. There is no evidence that he does.

"I think a lot of the case is based upon statements . . . [that] turned out to be totally false that mother had been [at the sushi restaurant] seven times in the last two week[s] or two times in the last two months; that mother was hiding under the table when the paramedics arrived. The person that was alleged to have said that said absolutely not. [Olivia] was under the table because she was afraid of all the things that were happening; all of these people [were] running around.

9

"What the court has to . . . evaluate in this case is [whether this is] a situation that indicates there is a continuing or future risk to the children or was this just an unfortunate confluence of events, her surgery, the sun, medication she had taken that was more or less a one-time problem, and I think that the evidence shows it was the latter not the former.

"I find mother credible. I also would like to note that probably the two other people in the world that have the most skin in the game in terms of these children are the fathers. And I notice that . . . [on] page 13 of the jurisdiction/disposition reports, [counsel] quoted the fact that [Logan's father] [had] said, a few times I called and her language was slurred. He says this was years and years ago. Talking about the current [situation, Logan's father said] I'm not really worried about [Logan]. I know she loves him and cares for him. I know . . . when she is with him she is good. [¶] [Olivia's father] was read the allegations of (b)(1) which is the charging allegation in this case. [Olivia's father] said – on page 13, [he was] asked if the allegation was correct. He said no. She is under a doctor's care. I have never felt that she was a danger or I would have intervened. He also said – talking about what happened at the restaurant . . . – [t]his is a non-issue. . . . Olivia shouldn't have anyone take [her] . . . from me or her mother. It's very traumatizing for her. I think it is a big misunderstanding. It is causing problems with Olivia.

"So, basically, what I have to look at is the entire body of evidence, including the fathers' views and including mother who[m] I find very credible. And I don't believe the petition has been proven by a preponderance of the evidence, so I am dismissing the petition."

On September 10, 2015, the juvenile court dismissed the petition with prejudice based on insufficient evidence. The same day, the court denied a request to stay the dismissal order.

## V.

### Appeal and Petition for Writ of Supersedeas

DCFS and the children timely appealed from the order dismissing the petition. On September 22, 2015, the children filed a petition for writ of supersedeas and request for a

stay of the dismissal order, which DCFS joined. This court issued a temporary stay order on September 24, 2015, and on November 4, 2015, we granted the petition for writ of supersedeas and ordered the September 10 order stayed pending the resolution of this appeal.[3]

## DISCUSSION

## I.

## Appealability and Standard of Review

DCFS and the children (collectively, appellants) assert that the evidence did not support the juvenile court's dismissal of the petition—i.e., its implicit conclusion that the children had not suffered, nor was there a substantial risk they would suffer, serious physical harm or illness as a result of mother's failure or inability to adequately supervise or protect them.

An order dismissing a dependency petition after an adjudication of the petition on the merits is appealable. (*In re Michael H*. (2014) 229 Cal.App.4th 1366, 1374, citing *In re Andrew A*. (2010) 183 Cal.App.4th 1518, 1525, fn. 4; *In re Sheila B.* (1993) 19 Cal.App.4th 187, 195-198.) "Such a dismissal results from the juvenile court's determination that [DCFS] has failed to prove the allegations of the petition and the need for exercising juvenile court jurisdiction over the child or children named in the petition. An order dismissing a dependency petition is appealable because, '[u]nlike a jurisdiction order, which is followed by an adjudication of dependency and many possible subsequent orders, nothing follows a dismissal order: It is the end of the matter, and the child goes

---

**3** This court's stay order provided: "Pursuant to California Rules of Court, rule 8.112(d)(l), the order filed September 10, 2015 dismissing the Welfare and Institutions Code section 300 petition filed on behalf of the minors is stayed pending resolution of the appeal in this matter. . . . [T]he detention order of July 29, 2015, releasing the minors to their respective fathers, granting mother monitored visitation three times per week, and granting the Department of Children and Family Services discretion to liberalize visitation, remains in effect. Pending resolution of the appeal, the juvenile court is free to issue any subsequent order, based on new facts or a change of circumstances."

home.' (*In re Sheila B*.[, *supra*,] 19 Cal.App.4th [at p.] 197, fn. omitted.)" (*In re Michael H.*, *supra*, at p. 1374.)

Where, as here, the issue on appeal turns on a failure of proof at trial, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant[s] *as a matter of law*. [Citations.] Specifically, the question becomes whether the appellant[s'] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1528, italics added.)

## II.

## The Juvenile Court Did Not Err by
## Dismissing the Dependency Petition

Mother's regular use of prescription drugs to control chronic pain is not in dispute. Also undisputed is that mother regularly used morphine and Soma, both of which can be habit-forming (<https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html> (as of June 22, 2016); <http://www.spine-health.com/treatment/pain-medication/muscle-relaxants> (as of June 22, 2016)); that mother had been arrested twice for driving under the influence of prescription medication, sometimes in combination with alcohol; and that some of mother's doctors had expressed concern about the amount of medication mother was taking, as well as about her regular use of morphine and muscle relaxants together.[4]

The issue before the juvenile court, however, was not whether mother was taking habit-forming narcotic painkillers, or even whether she was improperly combining those painkillers with other drugs. Rather, the issue was whether mother's prescription drug

---

[4] For example, the emergency room physician who treated mother in July 2015 advised in his discharge instructions that mother should "significantly decreas[e] the amount of narcotic medication you are taking," "[avoid taking] any medicine such as morphine along with a muscle relaxer medication or benzodiazepine medication such as Xanax or Ativan," and "consider[] prescription medication rehabilitation."

use created a *substantial risk* that Logan and Olivia would suffer "*serious physical harm or illness* . . . as a result of the failure or inability of [mother] to adequately supervise or protect" them. (§ 300, subd. (b)(1), italics added.)

Appellants urge that on this record, the trial court could not reasonably have concluded that the children were *not* at substantial risk of harm because mother's prescription drug use "too often left mother in an altered state and unable to care for her children." However, it is not this court's role to reweigh the evidence; our role is limited to determining whether, as a matter of law, the evidence compelled an order sustaining the petition. For the reasons that follow, we reject appellants' contention that mother's history compels the conclusion that the children were at risk.

*Mother's July 2015 hospitalization:* Appellants suggest that "the fact [mother] took prescription medication that indisputably left her in an altered state . . . including when she was with her child at the sushi restaurant, supported section 300, subdivision (b), jurisdiction." There was evidence, however, from which the juvenile court reasonably could have concluded that the July 2015 episode did not result from a drug overdose and was not likely to recur. In this regard, mother testified that on July 24, 2015, she "absolutely [did] not" take more medication than she had been prescribed, and said she became faint in the sushi restaurant "due to the lack of food intake and dehydration from [not] being able to drink . . . enough water" after her stomach surgery. Further, the blood test administered in the ER did not evidence a drug overdose; although it showed the presence of a narcotic, it did not reveal excess levels of such narcotics or the presence of any medication for which mother did not have a valid prescription. And, mother said she had taken the very same medication both before and after July 24, but had not had a similar incident.

*Mother's use of morphine and Soma in combination:* Appellants note that mother's ER physician had advised her in July 2015 that "tak[ing] any medicine such as morphine along with a muscle relaxer. . . . is dangerous and potentially life threatening," but that mother nonetheless continued taking these drugs in combination. Based on this evidence, appellants assert that mother lacked the capacity to adequately care for her

13

children.  Other evidence, however—including the testimony of mother and both fathers, which the trial court found credible—established that mother's use of morphine and Soma was under the supervision of a physician, and that it did not routinely leave her impaired.

*Mother's DUI arrests:*  Appellants note that on two occasions, mother "was . . . arrested due to being in an altered state after she acknowledged taking her prescription medication."  But although mother had past arrests for driving under the influence, there was evidence from which the juvenile court reasonably could have concluded that the circumstances that led to mother's past arrests would not recur.  In this regard, mother testified that her 2005 arrest resulted from alcohol consumption, and that she no longer drank alcohol.  Mother also testified that when she was arrested for driving under the influence in 2010, she had "just had knee surgery and . . . was on pain medication that . . . was new to [her] and didn't sit well with [her] system."  She said she no longer takes that medication.  Moreover, there was no evidence that the children were with mother at the time of either arrest.

*Substantial risk to the children:*  Appellants contend that the evidence before the juvenile court indisputably demonstrates that mother's drug use "too often left mother . . . unable to care for her children."  Contrary to appellants' contention, however, there was no evidence before the court that mother had ever failed to care appropriately for her children or had ever caused her children harm.  Indeed, all of the evidence is to the contrary.  The fathers of both children told DCFS they believed the children were safe and well cared for when they were with mother, and many of mother's friends and neighbors wrote letters to the court saying that mother was a caring and attentive parent.[5]

---

[5]     The minors assert as an additional basis for jurisdiction that mother permitted herself and Olivia to be driven to the sushi restaurant by mother's friend Megan, who the minors assert was intoxicated.  Megan's supposed intoxication was not alleged in the dependency petition; in any event, the jurisdiction report reflects that although the deputy who interviewed Megan "initially suspected [Megan] could be under the influence of a substance[,] after monitoring her for a long time, he thinks Megan's behavior could be the result of a mental health diagnosis."

14

" '[W]hen different inferences may be drawn from undisputed facts, the appellate court should accept the inference drawn by the trial court, unless that inference is inconsistent with clear, positive and uncontradicted evidence.' " (*Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1107, quoting *Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 49.)  Because the inferences drawn by the juvenile court are consistent with the evidence, we "decline [appellants'] implicit invitation to review the record so as to recount evidence that supports [their] position (reargument) with the object of reevaluating the conflicting, competing evidence and revisiting the juvenile court's failure-of-proof conclusion." (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

## DISPOSITION

The order dismissing the juvenile dependency petition is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



LAVIN, J.




HOGUE, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.